| | |
|---|---|
| 1 | CRAIG H. MISSAKIAN (CABN 125202)<br>United States Attorney |
| 2 | MARTHA BOERSCH (CABN 126569)<br>Chief, Criminal Division |
| 3 | |
| 4 | GEORGE O. HAGEMAN (CABN 332457)<br>JARED S. BUSZIN (NYBN 5285838) |
| 5 | Assistant United States Attorney |
| 6 | 60 South Market Street, Suite 1200<br>San Jose, California 95113 |
| 7 | Telephone: (408) 535-5044<br>George.Hageman@usdoj.gov<br>Jared.Buszin@usdoj.gov |
| 8 | |
| 9 | Attorneys for United States of America |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,| ) | **CASE NO. 5:24-CR-00226-BLF-001** |
| Plaintiff, | ) ) ) | **UNITED STATES' SENTENCING MEMORANDUM** |
| v. | ) ) | Court:        Hon. Beth L. Freeman |
| GIL VASQUEZ a/k/a "Rhino," | ) ) | Hearing Date: August 26, 2025<br>Hearing Time: 9:00 a.m. |
| Defendant. | ) ) ) | |

## I.  INTRODUCTION

Gil Vasquez is the highest-ranking of the eleven Salinas Acosta Plaza (SAP) Norteños charged in the indictment. His most significant criminal acts are an armed robbery in 2014 and a disturbing attempted murder of a perceived rival gang member in 2016, for which he was sentenced to 15 years and 8 months in state custody. He served approximately half that time and was released in November 2023. By virtue of his time in custody, the defendant's standing within the broader Nuestra Familia organization increased significantly and he was able to wield considerable influence over members of SAP, both while he was still in custody and continuing after his release in late 2023 (until his federal arrest in May 2024). He used that influence to encourage other members of SAP to engage in acts of violence. Based on the need for the sentence to reflect the seriousness of the offense, the history and characteristics of the defendant, and to afford adequate deterrence, the government submits that 72 months' imprisonment is sufficient, but not greater than necessary, to achieve the goals set forth in 18 U.S.C. § 3553(a).

## II.  PROCEDURAL HISTORY

On April 18, 2024, the defendant and ten other members of SAP were indicted by a federal grand jury on one count of racketeering conspiracy in violation of 18 U.S.C. § 1962(d). Dkt. 1. On May 2, 2024, he was arrested and made his initial appearance in federal court. On May 27, 2025, the defendant pleaded guilty to the sole count. Dkt. 216. Sentencing was set for August 26, 2025.

## III.  OFFENSE CONDUCT

a. *The Enterprise: Salinas Acosta Plaza (SAP)*

SAP is a criminal street gang that operates in Salinas, CA, within the larger collection of Norteño criminal street gangs that align with the Nuestra Familia (NF) prison gang and funnel taxes and proceeds from their crimes on the street to Nuestra Familia gang members in prison. Norteño gang members associate with the color red, and the number "14" (signifying "N" as the 14th letter of the alphabet), including any variations of the number such as "4" and "XIV." PSR ¶ 9.

SAP originated in the 1990's in the Acosta Plaza apartment complex in Salinas at and around the 900 block of Acosta Plaza. The gang claims that apartment complex as its territory. SAP commonly uses the letters and numbers "SAP," "A," "P," "900" and "914," as well as the color red, to identify itself. SAP

UNITED STATES' SENTENCING MEMORANDUM   1
5:24-CR-00226-BLF-001

members also commonly wear clothing of the Atlanta Braves and Philadelphia Phillies baseball teams to represent the gang, given that the symbols of these teams prominently feature the letters "A" and "P". *Id.* ¶ 10. These symbols are commonly, though not universally, displayed by SAP members in tattoos, graffiti, drawings, hand signs, on clothing, and in photos, rap videos, and social media posts as a way of displaying their affiliation, loyalty, and commitment to the gang. *Id.* ¶ 11.

SAP's primary rivals are Sureño criminal street gang members. Sureños recognize the primacy of the Mexican Mafia prison gang, doing the bidding and following orders of Mexican Mafia members. For symbols, they claim the color blue and the number 13 (M is the 13th letter of the alphabet). The rivalry between Norteño and Sureño gang members in Salinas has resulted in numerous acts of violence, including murders, attempted murders, shootings, and assaults. Additionally, SAP members very often target victims who they perceive to be Sureño gang members but who are not actually gang-affiliated, which has led to several murders and attempted murders of non-gang-affiliated victims. *Id.* ¶ 12.

In order to gain entry into the gang, aspiring SAP members may be encouraged or required to put in "work," which is understood to mean criminal conduct such as shootings, robberies, and drug sales. SAP members gain admission, earn status and respect, and rise in rank by committing criminal acts that benefit the gang and/or by spending time in jail or prison for the same. *Id.* ¶ 13. SAP members engage in acts of violence, including acts involving murder and assault, against their rivals and, at times, fellow Norteños considered to have violated the gang's rules. SAP members also traffic in controlled substances and firearms. Violence is often the quickest way to gain admission and/or status for the individual gang member. Members are also expected to pay dues to the gang, with greater dues required of those members who traffic in controlled substances. The dues are used, in part, to acquire firearms for distribution, possession, and use by SAP members. *Id.*

SAP members meet and work together to carry out illegal activities for the benefit of SAP and its membership, and also to benefit, more generally, the Norteños and the NF. SAP members fight with other street gangs for control of territory from which they conduct drug trafficking and other crimes, and recruit and intimidate non-gang members. SAP members engage in acts of violence and intimidation to control illegal activities, to claim or maintain established territory, to retaliate against a rival gang or suspected

1 rival gang member, to earn notoriety and respect, to dissuade potential victims and witnesses from
2 reporting crime or cooperating with law enforcement, to discipline fellow gang members, and to send a
3 message to others that they are strong, powerful, and not to be provoked. *Id.* ¶ 14.

      b. *Defendant's Role in SAP*

From at least February 2007 and continuing through at least April 2024, the defendant has been an SAP Norteño gang member. *Id.* ¶ 16. He has "Salinas Acosta Plaza" tattooed on his chest and stomach, "900" on his left arm, "SAP" on his right arm, "Norteño" on his back, "N" on his neck, and "187" on his index finger. He wears these tattoos to demonstrate his membership and status within the gang. *Id.*

On July 8, 2014, another Norteño gang member and the defendant robbed a man sitting in his vehicle on a street in Salinas, CA. *Id.* ¶ 17. They pulled up alongside the man's vehicle. The defendant exited the passenger seat, brandished a knife with a wooden handle that he had tucked in his waistband, and demanded everything the man had. The man gave the defendant his phone and $80 in cash. The defendant got back into the passenger seat of the vehicle and fled. He was arrested shortly thereafter and brought to a police station. Before he could be fully searched, he was able to flush a plastic bindle of drugs down the toilet. In December 2017, he pled no contest to grand theft in Monterey County Superior Court and was sentenced to eight months in state prison. *Id.*

On February 25, 2016, three Norteño gang members and the defendant attempted to murder a man in a Sureño-associated residence in Salinas, CA, near where the defendant had been staying. *Id.* ¶ 18. The Norteños had previously demanded that one of the residents of that house leave the neighborhood because he was not welcome there. To ensure compliance, the four Norteños (armed with a shotgun and two handguns) entered the courtyard of the residence, saw a different man (the victim) playing cards with a few others, and started ripping off his clothes to see if he had any Sureño tattoos. They asked the victim if he "banged" (i.e. associated with any gangs). The defendant pointed his handgun at the victim's head and then pistol-whipped him in the head. The victim started to run but was shot in the back by one of the Norteños. In December 2017, the defendant pled no contest to state charges of assault with a firearm, assault with force likely to produce great bodily injury, and a gang enhancement and was sentenced to

fifteen years in state prison, to be served consecutively to the sentence described in the preceding paragraph. *Id.*

The defendant spent approximately 7.5 years in state prison until his release in late 2023. *Id.* ¶ 19. Because of his significant criminal activity (including multiple acts of violence), he had already gained a considerable amount of credibility and had ascended to a leadership role within SAP as the gang's "channel" responsible for collecting dues, passing orders down to lower-level SAP members, and passing messages up to higher-ranking Norteños including the Nuestra Familia. *Id.* During his lengthy period of incarceration, he rose up through the Norteño ranks, associated himself with "made" members of the Nuestra Familia prison gang, and became responsible for passing the Nuestra Familia's orders and messages (including "kites" or small notes surreptitiously transmitted inside of a custodial facility) down to other incarcerated Norteños as well as SAP members (channels as well as rank-and-file members) out on the street. *Id.* He also received thousands of dollars of cash transfers from multiple SAP members through digital payment applications like CashApp and distributed the proceeds to the Nuestra Familia as well as to other incarcerated gang members. *Id.*

Because of his high status, he was able to exert significant influence over the activities of those SAP members out on the street. For example, in April 2023, while still in state prison but long after his convictions for the 2014 and 2016 incidents, he encouraged SAP members out on the street to engage in more acts of violence against rival gang members or others who disrespected the gang. *Id.* ¶ 20. He also coordinated the collection of SAP gang dues out on the street, including for the stated purpose of getting more "straps" (i.e., guns) for the gang. *Id.* When he sent such instructions and messages to lower-ranking SAP members and associates, he knew that they and others would kill, and try to kill, actual and perceived rival gang members, other persons who defied the will of the gang (including gang members and those who had dropped out or "snitched" on the gang"), or if it was otherwise in the gang interest. *Id.* He communicated these messages through contraband cell phones that he possessed and had access to in state prison, and he used phone calls, text messages, and social media applications to communicate with associates inside and outside of prison.

Even after his release in late 2023, he remained involved in SAP gang activity, including the buying and selling of firearms, and the buying and selling of drugs like marijuana and "blue" M30 fentanyl pills. *Id.* ¶ 21. He utilized cell phones, social media applications, and the Internet to facilitate these activities. He understands and agrees that these activities affect interstate and foreign commerce.

## IV. SENTENCING GUIDELINES CALCULATION

### a. Current PSR Calculation

The PSR currently calculates the total offense level as 34 and the criminal history category as I, resulting in a guidelines range of 151-188 months. It does so by treating the 2014 robbery (resulting in an 8 month sentence) and the 2016 attempted murder (resulting in a 15 month sentence) as part of the "instant offense" and not as part of criminal history. Its calculation is based on U.S.S.G. § 4A1.2(a)(1), which states that a prior sentence (for criminal history point purposes) means any sentence "for conduct not part of the instant offense." *See* U.S.S.G. § 4A1.2(a)(1). As a result, the 2014 robbery and the 2016 attempted murder are listed in the PSR's criminal history section but are each accorded 0 points. PSR ¶¶ 50-51. Each of these crimes is then used to form their own groups—one group for the 2014 robbery and one group for the 2016 attempted murder—which results in a total offense level, after adding an enhancement for being an organizer/leader of a criminal activity involving 5+ participants and adjusting for grouping and acceptance of responsibility, of 34. *Id.* ¶¶ 28-47.

### b. Government's Objection

The government agrees that the total offense level should be 34. *Id.* ¶ 47. However, the government respectfully objects to the PSR's method of calculating the offense level, as well as the calculation of criminal history points. The government believes the total offense level should be 34, the criminal history category should be III, and the guidelines range should be 188-235 months.

While the 2014 robbery and the 2016 attempted murder are part of the "instant offense" in that they are racketeering acts that show a "pattern of racketeering activity" as required under the racketeering conspiracy statute, *see* 18 U.S.C. § 1962(d), they should not be considered part of the "instant offense" for sentencing guidelines purposes. U.S.S.G. § 2E1.1 application note 4 states:

Certain conduct may be charged in the count of conviction as part of a "pattern of

racketeering activity" even though the defendant has previously been sentenced for that conduct. Where such previously imposed sentence resulted from a conviction prior to the last overt act of the instant offense, treat as a prior sentence under §4A1.2(a)(1) and not as part of the instant offense. This treatment is designed to produce a result consistent with the distinction between the instant offense and criminal history found throughout the guidelines. If this treatment produces an anomalous result in a particular case, a guideline departure may be warranted.

U.S.S.G. § 2E1.1 app. n.4. This application note is specific to the unique racketeering context and should trump the more general rule found in U.S.S.G. § 4A1.2(a)(1). *See United States v. Soberanes*, 318 F.3d 959, 963-64 (9th Cir. 2003) (applying the "fundamental canon of statutory interpretation . . . that, when there is an apparent conflict between a specific provision and a more general one, the more specific one governs" to the application of sentencing guidelines); *see also United States v. Morales*, 655 F.3d 608, 639 (7th Cir. 2011) (discussing U.S.S.G. § 2E1.1 app. n.4 and stating that "in other words, RICO presents an exception to the general rule of § 4A1.2(a)(1)" (internal quotations and citations omitted)); *United States v. Gross*, 199 F. App'x 219, 244 (4th Cir. 2006) ("[T]herefore, prior convictions are treated differently in RICO cases and can be used to increase a defendant's sentence even though they involve the same conduct underlying the RICO charge"). There is no discretion here: the note says that in situations "where such previously imposed sentence resulted from a conviction prior to the last overt act of the instant offense, *treat as a prior sentence under § 4A1.2(a)(1) and not as part of the instant offense*." U.S.S.G. § 2E1.1 app. n.4 (emphasis added). This method avoids double-counting and also avoids the "anomalous result" warned about in application note 4. *See United States v. Smith*, No. 22-3104, 2024 U.S. App. LEXIS 25142, at *8 (2d Cir. Oct. 4, 2024) (noting that application note 4 "avoids the anomaly of treating [that] defendant . . . as a first offender with a criminal history category of I" (internal citations and quotations omitted)).

The defendant here was convicted of both the 2014 robbery and the 2016 attempted murder at the same hearing on December 5, 2017. PSR ¶¶ 50-51. The last overt acts of his instant offense—as admitted to in paragraph 2 of his plea agreement—are well after 2017. In paragraph 2(l), he admits: "in April 2023, while still in state prison, I encouraged SAP members out on the street to engage in more acts of violence against rival gang members" and that "when I sent such instructions and messages to lower-ranking SAP members and associates, I know that they and others would kill, and try to kill, actual and perceived rival

UNITED STATES' SENTENCING MEMORANDUM   6
5:24-CR-00226-BLF-001

gang members . . . ." Dkt. 216 ¶ 2(l).  In paragraph 2(m), he admits: "even after my release in late 2023, I remained involved in SAP gang activity, including the buying and selling of firearms, and the buying and selling of drugs like marijuana and 'blue' M30 fentanyl pills." *Id.* ¶ 2(m).  It is these overt acts—which took place long after his convictions in 2017—that form the basis for the parties' agreed-upon base offense level of 33 for "conspiracy to commit murder" under "U.S.S.G. § 2A1.5." *Id.* ¶ 7(a).

Therefore, the government believes the 2014 robbery and 2016 attempted murder must be considered as part of "criminal history" and not as part of the "instant offense."  The defendant should have 5 total criminal history points, putting him in criminal history category III.  He should continue to have a total offense level of 34, but it should be calculated as follows: one group for "conspiracy to commit murder" under U.S.S.G. § 2A1.5 with base offense level 33, plus 4 points for being an organizer/leader of a criminal activity with 5 or more participants under U.S.S.G. § 3B1.1, and less 3 points for acceptance of responsibility.  *See* Dkt. 216 ¶ 7.  His guidelines range for criminal history category III and total offense level 34 should be 188-235 months.

**V.    APPLICABLE LAW**

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a).  *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).  The Court should begin the process of determining an appropriate sentence by calculating the correct sentencing range under the Guidelines.  *Id.*  After determining the appropriate Guidelines calculation, the Court should then evaluate the sentence for substantive reasonableness in light of the factors set out in Section 3553(a).  *Carty*, 520 F.3d at 991-93.

Under 18 U.S.C. § 3553(a), in arriving at the appropriate sentence for the defendant, the Court should consider these factors applicable to this case, among others: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense; (3) the need for the sentence to afford adequate deterrence; (4) the need for the sentence to protect the public from further crimes of the defendant; (5) the need for the sentence to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (6) the need to avoid unwarranted sentence disparities

among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

**VI.   RECOMMENDED SENTENCE AND SECTION 3553(a) FACTORS**

Upon consideration of the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553(a)—and in particular the need for the sentence to reflect the seriousness of the offense, the history and characteristics of the defendant, and to afford adequate deterrence—the government respectfully recommends a sentence of 72 months' imprisonment.

   *a. Severity of Prior Conduct*

The 2016 attempted murder incident—which technically only resulted in a conviction for assault with a firearm, assault likely to produce great bodily injury, and a gang enhancement—contains some particularly disturbing details. In the week prior to the incident itself, the defendant and a fellow Norteño tried to coerce a man they believed to be affiliated with the Sureños into leaving the neighborhood. When the man refused to leave, they beat him up, gave him one week to leave, threatened to come back every day until he left, threatened to kill him if he reported the assault, and specifically told his pregnant girlfriend that they were going to "stab every part of [her]." PSR ¶ 51. On the day of the incident, the defendant and other Norteños went back to the house to look for the man. *Id.* When they couldn't find him, they instead found a different victim, started ripping off his clothes, and asked him if he associated with any gangs. *Id.* The defendant pistol-whipped him in the head. When the victim tried to run away, he was shot in the back. *Id.* The motive to protect gang territory, the disregard for who was the "correct" target, the threats to intimidate someone from calling the police, and the threats to stab a pregnant woman's stomach are all aggravating.

   *b. Continued Conduct During and After Incarceration*

One would hope that receiving a 15+ year prison sentence would deter someone from continuing to engage in criminal conduct. That was not the case with this defendant. While in custody, he continued to rise through the ranks and associate with the Nuestra Familia prison gang. He took on a leadership role inside prison, such as by coordinating and collecting gang dues from SAP members and affiliates both inside and outside of custody as recently as the fall of 2023 (prior to his release in November 2023). *See*

Dkt. 216 ¶ 2(k). He coordinated the collection of "straps" (i.e., guns) coming to the gang. *Id.* ¶ 2(l). He continued to encourage acts of violence from inside prison walls, such as in April 2023 when he encouraged those out on the street to "have someone put a strap in one of them dudes mouth." *See id.* He passed messages like these knowing that they would be perceived by lower-ranking SAP members as instructions to kill or try to kill people. *Id.* He also admitted to engaging in continued drug and firearms trafficking after his release in late 2023 prior to his federal arrest in May 2024. *See id.* ¶ 2(m).

   *c. Recognition of Personal History*

  The defendant's prior criminal acts—particularly the 2016 attempted murder—are disturbing. At the same time, the government recognizes that he has already served state prison sentences for those crimes. He received good time credit even while he was clearly still engaged in gang activity from inside prison walls, but nevertheless, he completed those sentences as ordered. And while treating these prior acts as racketeering acts and as criminal history are permitted under 18 U.S.C. § 1962(d) and the sentencing guidelines, the fact that he has already served time factors significantly into the government's recommended variance below the guidelines. The government also recognizes that his activity since his release from state custody in November 2023, while certainly still criminal, still gang-affiliated, still a racketeering act, and still punishable, is nevertheless less serious that the acts from earlier in his life. Whether he would have stayed on that criminal path and fully resumed his leadership role or not if given more time between the time of his release (November 2023) and the time of his federal arrest (May 2024) is speculative, but that too is a factor in the government's recommended variance and something fairly considered under 18 U.S.C. § 3553. Lastly, the defendant's prompt acceptance of responsibility—the first to do so in this case—is also worth consideration in sentencing.

## VII. VICTIM IMPACT AND RESTITUTION

  As of this filing, the government has not received any Victim Impact Statements for the defendant's sentencing. The government is also not aware of any victims who wish to speak at sentencing, or any restitution requests, at this time. If any of the above are received prior to or at sentencing, the government will inform the Court.

## VIII. CONCLUSION

Gil Vasquez is the highest-ranking of the eleven charged defendants. His 2016 attempted murder was disturbing, and his criminal activity unfortunately seems to have continued unabated while he was serving time for that incident and even after his release from custody. Because of his status, he continued to wield significant negative influence inside state prison walls and also out on the street where he encouraged lower-ranking SAP members to commit acts of violence. At the same time, he has already served time for his most serious criminal acts—namely the 2016 attempted murder. Based on the need for the sentence to reflect the seriousness of the offense, the history and characteristics of the defendant, and to afford adequate deterrence, the government submits that 72 months' imprisonment is sufficient, but not greater than necessary, to achieve the goals set forth in 18 U.S.C. § 3553(a).

DATED: August 19, 2025

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

*/s/*
GEORGE O. HAGEMAN
JARED S. BUSZIN
Assistant United States Attorneys